Jerome JARRETT, Plaintiff, Appellee,

v.

TOWN OF YARMOUTH, Gerard Britt, Cheryl Nugent Gomsey, Richard White, Defendants, Peter McClelland, Robert Chapman, Defendants, Appellants.

No. 00–2498.

United States Court of Appeals, First Circuit.

Heard Jan. 1, 2002.

Decided Oct. 25, 2002.

Leonard H. Kesten, with whom Deidre Brennan Regan and Brody, Hardoon, Perkins & Kesten were on brief, for appellants Peter McClelland and Robert Chapman.

Donald W. Cook, with whom Kathleen J. Wood were on brief, for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

TORRUELLA, Circuit Judge.

On December 16, 1994, Officer Peter McClelland released his police dog, Shadow, which apprehended Jerome Jarrett by biting Jarrett's leg after Jarrett had fled from the scene of a minor traffic accident. Jarrett subsequently sued Officer McClelland and the Yarmouth Chief of Police, Robert Chapman, under 42 U.S.C. § 1983, alleging, inter alia, that Officer McClelland had used excessive force when he released Shadow and that Chief Chapman tolerated a policy which created a pattern of unconstitutional conduct by Yarmouth police officers and, specifically, Officer McClelland.[1] After a bifurcated trial, a jury returned verdicts in favor of Jarrett against both Officer McClelland and Chief Chapman. The defendants appeal the verdicts, raising a whole host of challenges. After careful review, we reverse

---

1. Jarrett also sued three other police officers, Gerard Britt, Cheryl Nugent Gomsey, and Richard White, and the Town of Yarmouth ("Town").

the judgments on the grounds of qualified immunity.

## I. Factual Background

In the early morning hours of December 16, 1994, Jerome Jarrett attracted the attention of a Yarmouth Police officer by sitting in his car in a motel parking lot off Route 28. That officer, Gerard Britt, decided to follow Jarrett after seeing Jarrett exit the motel parking lot and quickly head in the opposite direction on Route 28. Officer Britt also radioed to another Yarmouth police officer, Richard White, who Officer Britt knew was in the vicinity. Consequently, two Yarmouth police officers ended up following Jarrett. However, neither of the officers activated his lights nor tried to stop Jarrett. Officer Britt simply clocked Jarrett's speed as in excess of sixty miles per hour.

After several minutes, Jarrett exited into another parking lot off Route 28. Officer White followed Jarrett into this parking lot while Officer Britt continued on Route 28, entering the parking lot from the opposite end. Now heading toward Jarrett's oncoming car, Officer Britt activated his lights. Jarrett did not stop. Rather, according to the testimony of Officers Britt and White, Jarrett and Officer Britt barely avoided colliding, and Officer Britt had to swerve abruptly. In contrast, Jarrett claimed that there was no near collision and that he never saw Officer Britt heading toward him. The parties agree, however, that Jarrett then continued into an adjoining parking lot where he hit a cement post. After hitting the post, Jarrett abandoned his car and fled, scaling a nearby fence.

At this point, there were two additional Yarmouth police officers in the vicinity: Officer Cheryl Nugent Gomsey and Officer Peter McClelland. Officer Gomsey had seen Jarrett driving quickly on Route 28, followed by the two officers in their marked patrol cars. She also saw Jarrett hit the post and run away. Officer McClelland had been attracted by radio communications made by Officers White and Britt, and he arrived shortly after Jarret had fled. In fact, Officer McClelland saw Jarrett hit the post and flee from a distance. One of the radio dispatches overheard by Officer McClelland was Officer White saying that he recognized the driver of the car, Jarrett, as a suspect in a prior armed robbery.

Armed with only the information that Jarrett was wanted for several misdemeanor violations and had possibly been involved in a prior armed robbery, Officers McClelland and Gomsey undertook to track and apprehend Jarrett. Officer McClelland, the K–9 officer for the Yarmouth Police, also took his dog, Shadow, to assist in finding Jarrett. Shadow, after being helped over the fence, was placed on his usual 15–foot lead. He then began tracking Jarrett with Officer McClelland running closely behind. Officer Gomsey jogged after them, keeping some distance behind so as to not contaminate the track. The area through which Shadow led the officers was residential and the path circuitous. According to the testimony of Officer McClelland, after he had been running for slightly less than twenty minutes, he saw a man standing in the middle of the road, about fifty yards away. At this point, Officer Gomsey had fallen behind and could not see Officer McClelland, Shadow, or Jarrett. Officer McClelland testified that he shouted, three times, "Stop, police or I'll send the dog." Officer Gomsey confirmed, in her testimony, that Officer McClelland issued several verbal warnings, which is "normal [and] routine." After issuing these warnings, Officer McClelland testified that the suspect accelerated, disappearing around the corner.

Only then, according to Officer McClelland, did he release Shadow with the directive to locate the suspect and hold him.

Shadow was trained under a "bite and hold" policy. This means that when he locates his target, Shadow will bite and maintain his hold until told to release. However, if the suspect struggles, the dog may lose his grip and rebite. This may cause the dog to bite several times, as it tries to maintain its hold. The uncontroverted evidence showed that "bite and hold" policies are the standard in the United States. An alternative, not widely adopted, is the "circle and bark" method. Under that training, a dog will circle his target, barking, until his handler arrives. If the target attempts to escape or begins to move, the dog will bite. Because Shadow was trained under the "bite and hold" method, Officer McClelland knew, when he released Shadow, that there was a high probability that the dog would bite the fleeing suspect.

After being released, Shadow followed the man and disappeared around the corner. According to Officer McClelland, Shadow was only out of his sight for thirty seconds, and when he found Shadow, Shadow had apprehended Jarrett by biting him on the leg. Officer McClelland then testified that he commanded Shadow to release Jarrett, and Shadow did. After Shadow released, Officer McClelland handcuffed Jarrett and called for backup. An ambulance arrived within five minutes and transported Jarrett to the hospital where he received treatment, including several stitches, and was released.

Not surprisingly, Jarrett recounted a slightly different version of events. He testified that he had just picked up his car,

recently purchased, after finishing his shift at work. As he drove through Yarmouth, he claims to have not noticed the police officers who were following him. Instead, he was having problems with his brakes and pulled into the parking lot to try to slow down. While in the parking lot, shortly before hitting the cement pole, Jarrett noticed the police lights, but he did not see a police cruiser heading toward his car at any point. After hitting the post, Jarrett decided to run away. He was afraid of being arrested because he was driving illegally and was on probation.

Jarrett said that after he jumped the fence, he got up and began to run. Within five seconds, he heard someone yell, "Stop." He apparently had fallen down at that point, and as he got back up, Jarrett heard someone say, "Stop or I'll let the dog go." Jarrett testified that he then stopped, placing his hands in the air. Then, he felt a dog jump on his back. A command was issued, by an unseen person, in a foreign language, and the dog bit him on the leg, at least twice.

Based on the events of that evening, Jarrett was eventually charged with several misdemeanor offenses: (1) operating a motor vehicle with a suspended license; (2) leaving the scene of an accident; (3) operating an uninsured motor vehicle; and (4) failing to stop for a police officer. He was also charged with several civil infractions: (1) operating an unregistered motor vehicle; (2) failing to yield at an intersection; (3) speeding; and (4) operating a motor vehicle with defective equipment.[2]

## II. Procedural History

Jarrett originally filed his complaint in the District Court of Massachusetts alleg-

---

**2.** On the night of December 16, 1994, there was an outstanding warrant for Jarrett's arrest. There had been a surrender hearing for which he had not appeared. However, it is undisputed that none of the officers knew that there was an outstanding warrant for Jarrett's arrest when they were chasing him.

ing that Officer Peter McClelland used excessive force when he released Shadow, an "instrument of potentially deadly force." Jarrett also sued the Chief of the Yarmouth Police, Robert Chapman, for tolerating a pattern and practice of excessive force by Officer McClelland.[3]

After defendants' motion to dismiss on the grounds of qualified immunity was denied, the case proceeded to a bifurcated jury trial. In the first stage, the jury considered Jarrett's excessive force claim against Officer McClelland. They returned a verdict in favor of Jarrett, finding that Officer McClelland used excessive force. They awarded compensatory damages in the amount of one dollar and no

punitive damages. Also, the jury, without being asked to do so, independently recommended that the Town of Yarmouth adopt a new standard for training its police dogs. Specifically, they recommended that "the Town of Yarmouth be required from this time forward to .... retrain current K–9 units and train all future K–9 units to use the find and bark method." [4]

After the jury returned this verdict, defendants-appellants filed a motion for judgment as a matter of law arguing that both Officer McClelland and Chief Chapman are entitled to qualified immunity. The district court denied this motion.

The trial then proceeded to its second phase, against Chief Chapman.[5] There,

---

3. Jarrett also sued the Town of Yarmouth ("Town") and Officers White, Britt, and Gomsey. Eventually, the claims against these four defendants were dismissed.

4. While the jury independently added this proposal, the parties agree that the Town was not a defendant during the first phase of the trial. Therefore, the jury's admonishment has no binding effect and imposes no liability upon the Town.

5. The record certainly creates some confusion as to whether the Town was a defendant during the second phase of the trial or whether the Town had been dismissed. A colloquy that occurred before phase two began possibly led plaintiff to believe that the Town had been reinstated as a defendant, although it could only be subject to a possible attorney's fees award. In fact, the only relief sought in the second phase was punitive damages, and all the parties recognize that the Town is immune from such damages. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). At various points in the record, the court and the defendants specify that only Chief Chapman is a defendant during phase two because of the Town's immunity. Only the plaintiff tries to insert references to the Town as a defendant, although never specifying the relief sought from the Town.

This possible confusion, however, is not enough to actually make the Town a defendant. The record is clear that the Town was

never identified, by the court, as a defendant. The jury instructions contain no reference to the Town as a defendant, and the verdict form specifies that Chief Chapman is the defendant without making any similar assertion about the Town. In regard to Chief Chapman, the verdict form asks:

> Has the plaintiff proved by a preponderance of the evidence that *the defendant, Robert Chapman, as Chief of the Yarmouth Police department,* permitted and tolerated a pattern and practice of unjustified, unreasonable and excessive force by Officer Peter McClelland with respect to the latter's deployment of the dog, Shadow?

(Emphasis added). In marked contrast, the verdict form does not identify the Town as a defendant; it simply asks if Officer McClelland acted "in accordance with the Town of Yarmouth [sic] policy and procedure." Because neither the jury instructions nor the verdict form asked the jury to judge the Town's liability or award any damages against it, the Town cannot be considered a defendant. Jarrett did not object to these instructions and, thus, lost any right to complain. *See* Fed.R.Civ.P. 51 (establishing that failure to object to a jury instruction waives the right to appeal any error). Furthermore, these questions were placed before the jury not only without objection from plaintiff but at his behest. If plaintiff intended the town to be a defendant, he should have been more specific. *See Figueroa–Torres v. Toledo–Dávila,* 232 F.3d 270, 272 (1st Cir.2000) (holding

the jury found that Officer McClelland had acted in accordance with the Town's policy and procedures when he released Shadow. The jury also found that Chief Chapman had "permitted and tolerated a pattern and practice of unjustified, unreasonable and excessive force by Officer Peter McClelland with respect to the latter's deployment of the dog, Shadow." After some confusion,[6] the jury awarded $50,000 in punitive damages to Jarrett.

After this second verdict, defendants-appellants filed another motion for judgment as a matter of law and a motion for a new trial, pursuant to Federal Rule of Civil Procedure 50(b). In support, defendants-appellants argued that the evidence did not support either verdict and, in the alternative, that both defendants are entitled to qualified immunity. The district court denied the motion, and defendants-appellants filed their notice of appeal.

### III. Discussion

Defendants-appellants raise multiple issues before this Court. We begin with the most promising of their arguments, that the district court erred in denying their motions for judgment as a matter of law on the grounds of qualified immunity.[7]

■ We review the denial of a Rule 50(b) motion *de novo*. *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 9 (1st Cir.1999). However, in conducting that review, we interpret the facts in the light most favorable to the verdict. *Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 699 (1st Cir.2000). We will not judge witnesses' credibility or evi-

dence's weight. *Id.* at 700. We also will reconcile factual conflicts in favor of the verdict and uphold that verdict unless the evidence only supports one conclusion, that the verdict cannot stand. *Walton v. Nalco Chem. Co.*, 272 F.3d 13, 18 (1st Cir.2001).

### A. Reconciling the jury verdicts

■ This case presents a slightly different challenge because we must first determine what the jury found. When we are confronted with potentially inconsistent jury verdicts, we must do our best to reconcile those verdicts. *See Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) (holding that "it is the duty of the courts to attempt to harmonize" jury verdicts); *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 358–59 & 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) (holding that while appellate courts should not redetermine facts found by a jury, it is their duty to view a jury's findings in a consistent manner); *cf. City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that in a bifurcated trial of an excessive force claim if a jury finds no constitutional violation by the individual police officer, the court will not proceed to consider the claim against the municipality or supervisor because to do so would be to invite inconsistent verdicts).

In the first stage of the trial, the jury found that Officer McClelland had used excessive force when he released Shadow, who subsequently bit Jarrett. There are

---

that defendant who failed to object to verdict form that did not require jury to specify basis of liability waived right to complain).

**6.** The jury originally awarded plaintiff attorney's fees and expenses. After objection, the district court, finding that the jury had to award a specific monetary figure, sent the jury back to deliberate further.

**7.** Because we hold that both defendants are entitled to the affirmative defense of qualified immunity, we find it unnecessary to address any of their other arguments, including the claim that the Town's "bite and hold" policy is unconstitutional.

two possible theories that could support the verdict. First, the jury could have believed Jarrett's story that he had clearly surrendered before Officer McClelland ordered Shadow to bite. No one disputes that, if this occurred, it is a violation of Jarrett's Fourth Amendment rights and no qualified immunity defense can be made. *See Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."). Second, the jury could have accepted appellants' version of events but found that Officer McClelland still acted unreasonably under the circumstances. Under this version, Officer McClelland released Shadow after issuing three verbal warnings and while Jarrett continued to flee. If this version is true, appellants argue that Officer McClelland is nevertheless protected by qualified immunity.

Normally, we would not have to resolve this dispute. We would just view the verdict in the light most favorable to Jarrett, the prevailing party, and uphold the result. *See Walton,* 272 F.3d at 18. Here, however, we must reconcile the verdict against Officer McClelland with the verdict against Chief Chapman, and the interpretation supported by Jarrett's testimony cannot be attuned with the jury's verdict in the second part of the trial.

After finding that Officer McClelland acted with excessive force, the same jury explicitly found that Officer McClelland acted in accordance with the policies and procedures of the Town of Yarmouth when he released Shadow. There is no evidence in the record that Yarmouth policies allow an officer to order a dog to attack a sus-

pect who has already surrendered. In fact, the only evidence in the record is precisely to the contrary. The police regulations, introduced at trial, clearly stipulate that force may only be used in specific situations:

> Non-deadly force may be used by a police officer in the performance of his duty:
>
> a. when necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self-inflicted injury; or
>
> b. when necessary to overcome resistance to lawful arrests, searches and seizures, and to prevent escapes from custody; or
>
> c. when in self-defense, or defense of another against unlawful violence to his person or property.[8]

No language in this regulation could possibly support a finding that it is the policy of the Yarmouth police to use *any* level of force against a suspect who has peacefully surrendered. No contrary regulations were introduced by plaintiff, and plaintiff did not argue that there was an unwritten policy of using force against such suspects. Therefore, no reasonable jury could have concluded both that Officer McClelland knew that Jarrett had surrendered when Shadow was released and that Officer McClelland acted in accordance with the policies and procedures of the Town of Yarmouth.

Furthermore, Officer McClelland explicitly testified that he was required to announce, "Stop, police or I'll release the dog," three times before releasing Shadow and that he did so before releasing Shadow to apprehend Jarrett. Officer Gomsey confirmed that it was "routine" to make

---

**8.** The regulations define non-deadly force as "that degree of force which in the circumstance is neither likely nor intended to cause great bodily harm." In contrast, deadly force is defined specifically as "that inflicted by firearms."

such an announcement and that Officer McClelland had issued such a warning. The plaintiff introduced no evidence to suggest that Officer McClelland was not trained in such a way. In fact, plaintiff never contested that proper procedures required Officer McClelland to make this announcement. Therefore, because the jury found that Officer McClelland acted in accordance with the policies and procedures of the Town of Yarmouth, the jury must have also found that Officer McClelland verbally warned Jarrett before releasing Shadow. It is the only possible interpretation of the jury's finding, in light of the introduced evidence.[9]

Because the jury must have found that Officer McClelland did not know that Jarrett had surrendered and that Officer McClelland issued the required warnings before releasing Shadow, the jury must have found that the release of Shadow was still excessive force under the circumstances. In other words, the jury must have believed Officer McClelland's story but still found that the force he used was unreasonable in light of the circumstances. We must then consider whether this verdict can stand as a matter of law.

## B. Qualified Immunity for Officer McClelland

■ Officer McClelland raised the defense of qualified immunity before, during, and after the trial, and he renews that claim before us. Whether an officer is entitled to qualified immunity is a question of law, to be determined by the courts. *Starlight Sugar, Inc. v. Soto*, 253 F.3d 137, 141 (1st Cir.2001). We therefore review the question *de novo*. *Davis v. Rennie*, 264 F.3d 86, 113 (1st Cir.2001). While courts normally determine whether qualified immunity is available prior to trial,

there are cases where a jury needs to resolve crucial factual questions before a court can resolve the qualified immunity question. *Kelley v. LaForce*, 288 F.3d 1, 7 (1st Cir.2002).

■ Qualified immunity is an affirmative defense for government officials in § 1983 suits which allege constitutional violations. The doctrine shields officials from civil damages liability so long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Practically, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted).

■ To determine whether a government official is protected by qualified immunity, courts make two inquiries: (1) whether the plaintiff suffered a constitutional injury, *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), and (2) whether "an objectively reasonable official would have believed that his conduct was lawful 'in light of clearly established law and the information that the official possessed at the time of his allegedly unlawful conduct,'" *Kelley*, 288 F.3d at 6 (quoting *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir.1991)). *Accord Wilson*, 526 U.S. at 609, 119 S.Ct. 1692.

■ Here, Jarrett alleged that Officer McClelland acted unreasonably when he

---

**9.** The evidence is also uncontroverted that Officer McClelland issued a verbal warning.

All of the witnesses recounted hearing a warning.

released Shadow and that this release constituted excessive force. The Fourth Amendment protects against the use of excessive force in the course of arrests and investigatory stops. U.S. Const. amend. IV (protecting against "unreasonable" seizures); *see also Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that all claims of excessive force should be analyzed under the Fourth Amendment); *Aponte Matos v. Toledo Dávila,* 135 F.3d 182, 191 (1st Cir. 1998) (same). The jury agreed and found that Officer McClelland acted with excessive force when he released Shadow, knowing only that Jarrett was wanted for minor traffic violations and may have been previously wanted in connection with an armed robbery. We assume, *arguendo,* that there is sufficient evidence to support this finding and that Jarrett suffered a constitutional injury.

However, "even state actors who commit constitutional violations may be entitled to qualified immunity," *Camilo–Robles v. Hoyos,* 151 F.3d 1, 6 (1st Cir.1998), depending on whether they acted in an objectively reasonable manner under clearly established law, *Kelley,* 288 F.3d at 6. We then turn to the second part of the qualified immunity inquiry: whether a reasonable officer would have believed that releasing a trained police dog to apprehend Jarrett was lawful in light of both clearly established law and the particular circumstances of that night. *See Wilson,* 526 U.S. at 609, 119 S.Ct. 1692; *Kelley,* 288 F.3d at 6. At the time that Officer McClelland released Shadow, in December 1994, several major cases had addressed the use of trained police dogs to apprehend suspects. We now turn to an examination of those cases to determine what a reason-

able officer would have known on the night in question.

We begin with an issue which has been lurking in the background, although appellee now disclaims any explicit attachment. The issue is whether the use of police dogs to apprehend suspects by biting them constitutes deadly force.[10] This is an important question because the Supreme Court has outlined specific rules governing the use of deadly force to seize suspects. *See Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). At a minimum, *Garner* requires that a suspect pose an immediate threat before an officer can use deadly force. *Id.* at 11, 105 S.Ct. 1694. Nothing in the record supports the conclusion that Jarrett posed an immediate threat to anyone. Under these circumstances and clearly established law, no reasonable officer would have believed deadly force was justified. Therefore, if a reasonable officer should have believed that releasing Shadow was deadly force, Officer McClelland is not entitled to qualified immunity.

One of the earliest, and most important, opinions regarding the use of police dogs addressed whether their deployment is deadly force. In *Robinette v. Barnes,* 854 F.2d 909 (6th Cir.1988), the police, in the course of investigating a suspected burglary, released a dog into a building, believing that their suspect was inside. *Id.* at 911. The police issued several verbal warnings and then set the dog free, with the command, "Find him." *Id.* When the dog found the suspect, the dog bit the suspect in the neck. *Id.* The victim quickly died from his wound. *Id.* The administratrix of the decedent's estate then brought suit under the Fourth Amendment and alleged the use of "unnecessary deadly force." *Id.*

---

**10.** Jarrett's original complaint alleged that Shadow is an "instrument of potentially deadly force." Jarrett also requested a deadly force instruction as part of the jury instructions.

Despite the fact that a death resulted, the Sixth Circuit held that "the use of a properly trained police dog to apprehend a felony suspect does not carry with it a 'substantial risk of causing death or serious bodily harm.' " *Id.* at 912. *Robinette* thus established a baseline presumption that releases pursuant to general "bite and hold" policies are subject only to the rules governing the use of non-deadly force.

Subsequent cases have consistently followed this approach and held that the use of police dogs does not constitute deadly force. *See Vera Cruz v. City of Escondido*, 139 F.3d 659 (9th Cir.1998) (holding that the plaintiff failed to present evidence that the use of a trained police dog presents more than a remote possibility of death and therefore plaintiff was not entitled to a deadly force instruction); *cf. Quintanilla v. City of Downey*, 84 F.3d 353 (9th Cir.1996) (holding that because the plaintiff suffered only non-life threatening injuries, did not require serious medical attention, and the dog released on command, he was not entitled to a deadly force instruction). Consequently, it is far from clearly established law that the use of trained police dogs to bite and detain suspects is deadly force, subject to the requirements of *Garner*, and no reasonable officer would have believed himself constrained by the rules governing the use of deadly force.

This, however, does not completely answer the question of whether a reasonable officer in December of 1994 would have known that releasing a dog pursuant to a general "bite and hold" policy, like the Town of Yarmouth's policy, is unconstitutional. We note first that there is no case that has held these policies to be unconstitutional. Only one case, decided by a district court, could be read to suggest that acting pursuant to such policies raises constitutional problems of which a reasonable officer should be aware. In *Marley v. City of Allentown*, 774 F.Supp. 343 (E.D.Pa.1991), *aff'd* 961 F.2d 1567 (3d Cir. 1992), the court held that an officer who released his dog to apprehend a misdemeanor suspect acted in an objectively unreasonable manner under the Fourth Amendment. *Id.* at 345–46. However, the court also relied upon the fact that evidence suggested that the suspect had visibly surrendered before the officer released the dog. *Id.* at 346. Therefore, it is hard to accord any particular significance to the decision in *Marley* because everyone agrees that siccing a dog upon a compliant suspect is a clear constitutional violation. *Mendoza*, 27 F.3d at 1362.

Furthermore, other courts have concluded that "bite and hold" policies are not contrary to clearly established law. In *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir.1998), the Ninth Circuit addressed an incident which occurred on November 20, 1993, slightly more than one year before the event of which Jarrett complains. There, the court determined that a " 'bite and hold' policy did not violate clearly established law concerning the use of excessive force." *Id.* at 1092. Additionally, an officer acting in accordance with that policy would be entitled to qualified immunity. *Id.* In reaching this conclusion, the Ninth Circuit found that *Marley* failed to provide "sufficient notice" that acting under typical "bite and hold" policies could be unconstitutional. *Id.* at 1092 n. 1.

Rather than finding releases pursuant to "bite and hold" policies to be constitutionally questionable, courts have principally worried about releases that did not comport with those policies. For example, in *Watkins*, the court denied summary judgment on the basis of qualified immunity because the plaintiff testified that the officer had allowed the dog to continue biting even after the plaintiff was fully compliant

and no longer posed a threat. *Id.* at 1093. In *Vathekan v. Prince George's County*, 154 F.3d 173 (4th Cir.1998), the Fourth Circuit concentrated on the issue of notice. *Id.* at 179. That case dealt with a truly horrific scenario where the police had released a dog into an occupied home, reasonably believing that a burglar might be lurking inside. *Id.* at 176. Instead of finding a burglar, the dog attacked the lawful resident who was asleep in her bed, crushing her skull. *Id.* at 177. The court denied summary judgment on the basis of qualified immunity because it found that there was a genuine issue as to whether the officers had issued a verbal warning before releasing the dog. *Id.* at 180–81. Furthermore, the court held that, as of 1995, it was objectively unreasonable to release a police dog without first giving a verbal warning. *Id.* at 179. This decision, however, suggests that a release that follows a verbal warning would raise no constitutional problems.

■ There is, however, one way in which the instant case differs from *Robinette, Watkins,* and *Vathekan* and instead resembles *Marley:* Jarrett was only suspected of having committed misdemeanors and traffic violations, not any felonies. *Marley* certainly suggests that using a police dog to apprehend a "fleeing misdemeanant" is objectively unreasonable and, hence, unconstitutional. 774 F.Supp. at 345–46; *cf. Mendoza v. Block*, 27 F.3d 1357, 1362–63 (9th Cir.1994) (emphasizing both the fact that the dog bite victim was wanted for a bank robbery, a felony, and the additional facts that the suspect was

possibly armed and hiding on private property when holding that the officer acted in an objectively reasonable manner when he released his dog).[11] Furthermore, the Supreme Court has explicitly directed the courts to consider the severity of the crimes involved when evaluating excessive force claims. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Courts are supposed to look to "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; accord Gaudreault v. Municipality of Salem*, 923 F.2d 203, 205 (1st Cir.1990) (per curiam). Therefore, it is clearly established law, and was so in December of 1994, that officers should consider the type of crime for which a suspect is wanted when deciding what level of force is appropriate. This, however, is hardly determinative. *Graham* and other cases make clear that the severity of the crime at issue is not the only fact of importance, rather it is to be weighed in light of other surrounding circumstances. *See, e.g., Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

Moreover, another influential Sixth Circuit case held that it was objectively reasonable to use a dog to apprehend a particular misdemeanor suspect. *Matthews v. Jones*, 35 F.3d 1046 (6th Cir.1994). The facts of that case were actually very similar to the case at bar. In *Matthews*, a police officer attempted to stop a driver who was speeding and driving erratically.

---

**11.** Jarrett also directs our attention to *Kerr v. City of West Palm Beach*, 875 F.2d 1546 (11th Cir.1989), which he claims supports the proposition that using dogs to apprehend misdemeanor suspects is unconstitutional. That case, however, dealt with three apprehensions where the officers had ordered their dogs to bite suspects without allowing the suspects to first surrender or after the suspects had actually surrendered. *Id.* at 1551–52. This is conduct that everyone agrees constitutes excessive force, whether the suspect is wanted for a felony or a misdemeanor. As such, its holding hardly supports a general claim that using police dogs against misdemeanor suspects may be constitutionally invalid.

*Id.* at 1048. A car chase ensued which ended when the driver pulled into some woods and fled on foot. *Id.* Shortly thereafter, a K–9 unit arrived on the scene and began to track the fleeing driver. *Id.* The dog eventually signaled that he had found the target but did not bite. *Id.* The officers then ordered the driver to stay still. *Id.* The driver did not comply, and the dog bit him. *Id.* Based on these facts, the Sixth Circuit concluded that "there is no evidence whatever in this record which could support a claim that [the dog] was not used in an 'appropriate manner.' " *Id.* at 1051 (citing *Robinette*, 854 F.2d at 913). Therefore, the court concluded "that no reasonable jury could conclude that the use of the police dog to apprehend Matthews was not objectively reasonable." *Id.* at 1052.

Here, Officer McClelland knew that he was chasing Jarrett, who was wanted for several misdemeanor and traffic violations. This, however, was not all. Officer McClelland had overheard Officer White say that Jarrett had been a suspect in a prior armed robbery. Jarrett had fled from a seemingly inconsequential accident, a suspicious reaction. Furthermore, Jarrett was fleeing through a residential neighborhood in the middle of the night. It was difficult to see, and Officer McClelland had no way of knowing whether Jarrett was armed or not. Under these circumstances, taking into account the disposition of prior cases, it was not clearly established that releasing Shadow would be excessive force. In fact, the situation was very similar to that addressed in *Matthews* where the Fourth Circuit held that releasing the dog was

objectively reasonable. *Id.* Therefore, Officer McClelland is properly entitled to qualified immunity.[12]

## C. Qualified Immunity for Chief Chapman

 Chief Chapman also raised the affirmative defense of qualified immunity before the district court and reasserts that defense before us. Like individual officers, supervisors can also avail themselves of the protections of qualified immunity. *Camilo–Robles*, 151 F.3d at 5–6. In order for a supervisor to be held liable for the actions of a subordinate under § 1983, two conditions must be fulfilled: (1) the subordinate must have committed a constitutional violation, and (2) "it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Id.* at 6. Again, we assume, *arguendo*, that Officer McClelland violated Jarrett's Fourth Amendment rights. Therefore, Chief Chapman can be held liable if his actions predictably led to Officer McClelland's use of excessive force, either by creating a policy or being deliberately indifferent to possible constitutional violations by his subordinates. *Id.* at 6–7.

As discussed above, in December 1994, it was not clearly established that apprehension of suspects pursuant to "bite and hold" policies created constitutional problems. *See Watkins*, 145 F.3d at 1091. In fact, the Ninth Circuit had specifically held that, as of 1993, a chief of police was entitled to qualified immunity because there was no clearly established law

---

**12.** It is important to note the limited nature of our holding. We do not declare that Officer McClelland acted in an objectively reasonable manner. In fact, we assume, *arguendo*, that the jury reached the correct conclusion when it found that Officer McClelland acted unrea-

sonably. Rather, we find that he acted reasonably under clearly established law. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (emphasizing that the reasonableness prongs for excessive force and qualified immunity are distinct inquiries).

against "bite and hold" policies. *Id.* at 1094 n. 2.

The Ninth Circuit, a frequent arbiter of excessive force cases involving dog bites, has recognized that "bite and hold" is "neither a new nor a unique policy." *Chew,* 27 F.3d at 1447. In fact, training dogs in accordance with this policy is "long-standing, widespread, and well-known." *Id.* This decision, issued a mere four months prior to the night in question, found that Los Angeles' "bite and hold" policy did not violate the clearly established laws regarding both the training and deployment of police dogs. *Id.* at 1448. The court continued to find:

> [W]e simply do not believe that, given the historical facts and circumstances, the use of police dogs in the manner prescribed in the Los Angeles Police Department's policy is sufficiently similar to other uses of force held to be unconstitutional by the courts to put reasonable law enforcement officials on notice that the department's policy violated the Fourth Amendment.

*Id.* at 1450. The court relied upon that finding to conclude that the officers responsible for promulgating the "bite and hold" policy were entitled to qualified immunity. *Id.*

This, however, is only half of the *Chew* court's decision. The Ninth Circuit also reversed the grant of summary judgment in favor of the city and allowed the plaintiff to pursue his claim that the "bite and hold" policy, itself, was unconstitutional. *Id.* at 1439–40. The city, which cannot invoke the protections of qualified immunity, prevailed below by convincing the district court that this particular dog release was objectively reasonable. *Id.* at 1439. The Ninth Circuit concluded that there was a genuine issue of material fact as to whether the officer actually acted in accordance with city policy. *Id.* at 1440. While this theory does not implicate the general constitutionality of the policy, the court specifically allowed the plaintiff to proceed on the alternate theory that the policy was unconstitutional. *Id.* This decision, then, establishes that "bite and hold" policies are open to constitutional challenges. It does not, however, establish that they are unconstitutional. *Id.* at 1451.

■ While *Chew* allowed a constitutional challenge to a "bite and hold" policy to proceed, it can hardly be considered a clear statement alerting police supervisors that their "bite and hold" policies are unconstitutional. In fact, the *Chew* decision hardly changed the legal landscape; it just allowed a challenge to proceed. Additionally, the evidence presented in the case at bar only supports the conclusion that such policies continue to be the norm across the country. Therefore, we hold, that as of December 1994, the law was not clearly established that a supervisor could be held liable for the actions of an officer acting pursuant to a "bite and hold" policy and that as a result such a supervisor is entitled to qualified immunity.

■ This, however, does not determine the question as to Chief Chapman because Jarrett also alleged that the chief had failed to adequately train and supervise Officer McClelland. While a supervisor may indeed be held liable for failure to adequately train or supervise, *see, e.g., Aponte Matos,* 135 F.3d at 192 (noting that a supervisor may be held liable for failure to discipline a "miscreant officer"), Jarrett's failure to train argument essentially boils down to a complaint with the "bite and hold" policy in Yarmouth. He does not allege that Officer McClelland was improperly trained under this policy. In fact, all the evidence supports the conclusion that Officer McClelland was exceptionally well-trained. The uncontradicted testimony was that Officer McClelland and

Shadow were one of the highest-rated K–9 teams in the nation. They had even been recognized internationally. Rather than attacking the substantial training that Officer McClelland and Shadow received, Jarrett essentially alleges that Chief Chapman was deliberately indifferent because he allowed the "bite and hold" policy in Yarmouth to stand. This argument is no different than claiming that Chief Chapman is liable because he promulgated a "bite and hold" policy, and, as such, Chief Chapman is entitled to qualified immunity.

### IV. Conclusion

Because both the defendants are entitled to qualified immunity, we reverse.

*Reversed.*